## UNITED STATES *v*. MYERS (No. 45).[1]

1. UNMANUFACTURED OR ROUGH-TRIMMED MICA.

   The evidence being in conflict as to the actual commercial designation of a large part of the mica of this importation, and the Board of Appraisers having found these consignments to be unmanufactured or rough-trimmed mica, and not mica cut or trimmed in definite shapes or sizes, this finding of the board will be adhered to.

2. IBID.

   And this the more readily on a consideration of what had been, subsequent to the enactment of the tariff act of 1897, the established practice under the law in classifying mica at ports of entry; and further, in view of the fact that after attention drawn, the Congress retained in the tariff act of 1909 the precise language of the former statute that had been so construed.

3. MICA SPLITTINGS.

   Splittings of mica are not manufactures, but are rough-trimmed mica.

4. DUTIABLE.

   The importations of mica were dutiable, as unmanufactured or rough trimmed, under section 91, tariff act of 1909.

### United States Court of Customs Appeals, February 8, 1911.

APPEAL from decision of the Board of United States General Appraisers, G. A. 6989
(T. D. 30421.)

[Affirmed.]

*D. Frank Lloyd*, Assistant Attorney General (*Martin T. Baldwin* on the brief), for the United States.

*J. F. Zoller* (*M. F. Westover*, special counsel) for appellees.

Before HUNT, SMITH, and BARBER, Judges.

HUNT, Judge, delivered the opinion of the court:

This is an appeal by the United States from a decision of the Board of General Appraisers sustaining certain protests of the importers against the assessments of duty made by the collectors upon merchandise imported at the port of Plattsburg, N. Y., through Rouse Point, N. Y., and at the port of Albany, N. Y.

The merchandise imported through the port of Rouse Point consisted of 1,576 pounds of knife-trimmed mica from Canada, invoiced as "rough (knife) trimmed," and 28,512 pounds of thin-split mica, also from Canada, invoiced as "rough knife-trimmed and split." The merchandise imported through the port of Albany, N. Y., consisted of 4,305 pounds of sickle-trimmed mica, and 42,370 pounds of thin-split mica, from London and Calcutta, all invoiced as "Mica."

The collectors at both ports classified the mica as "cut or trimmed" or manufactured, requiring the payment of duty at the rate of 10 cents per pound and 20 per cent ad valorem, instead of at the rate of 5 cents per pound and 20 per cent ad valorem, the rate prescribed by the United States tariff law of 1909, for mica unmanufactured or rough-trimmed only.

---

[1] Reported in T. D. 31301 (20 Treas. Dec., 284).

As the decision of the case necessarily involves a construction of paragraph 91 of the tariff act of August 5, 1909, we quote the section:

91. Mica, unmanufactured, or rough trimmed only, five cents per pound and twenty per centum ad valorem; mica, cut or trimmed, mica plates or built-up mica, and all manufactures of mica or of which mica is the component material of chief value, ten cents per pound and twenty per centum ad valorem.

The most important contention of the Government's counsel is that it was error in the board to find that the merchandise was mica unmanufactured or rough trimmed only, because the evidence shows that the merchandise is mica cut or trimmed. It is also urged that part of the merchandise—the so-called mica "splittings"—should have been classified as manufactures of mica, and that what is referred to as trimmed mica by some of the witnesses should have been regarded as dutiable as "trimmed" mica under paragraph 91 of the tariff act of 1909.

For the purpose of showing the character of the merchandise covered by the importations involved, and as explanatory of the meaning of the terms "rough trimmed" and "cut" or "trimmed," used in the tariff act of 1909, heretofore quoted, the importers called a number of witnesses, each one of whom stated that he had had experience in the mining and manufacture of mica, and several of whom proved that they were familiar with the meaning of commercial terms relating to mica as used in the purchase and sale of such merchandise.

Frank C. Lord said that he was general foreman in the General Electric Works at Pittsfield, Mass., in charge of the mica used for flatirons; that an exhibit, numbered 2, invoiced as "rough knife-trimmed" mica, imported from Canada, was known in the trade as "rough trimmed" mica, and that after receiving such mica it had to be split to about three to four one-thousandths of an inch before it was blanked out to the proper forms.

Another witness, whose business was to take charge of the mica department of the General Electric Co., in Schenectady, N. Y., said that he was familiar with the varieties of mica, and that imported mica came in blocks and splittings; that block mica is mica that has been rough trimmed at the mines or at some clearing house, and all imperfections trimmed off, and trimmed down, so that everything that comes in is in perfect shape; that block mica is sometimes punched out to form segments, and that in other cases it is cut and split down for various purposes, and that split mica is built up into plates in various shapes for insulation purposes.

Another witness, qualified as one having had 40 years' experience in buying and selling mica, said that the only trade terms that he knew of were cut or uncut mica; that these terms have a uniform and general understanding; that within the term "cut" mica was included mica cut to some definite form or shape; that "untrimmed" mica

might mean anything where the edges were removed in any shape or manner; that "rough trimmed" mica was only a local term used in some places, but not generally in the buying or selling of mica; that mica is bought or sold as cut or uncut, and that uncut mica might cover untrimmed or closely trimmed mica, but would not cover mica that was trimmed to a pattern. This witness was asked by the general appraiser how he would know with what to fill an order for uncut mica. His answer was:

If it was rough mica mined like these crystals we should offer it as that; if it was in the advanced stage, we should, according to the stage, whether roughly split and not trimmed or roughly split and trimmed— * * *. It is all uncut mica until it has been cut with the knife.

He said that cutting would be in the nature of some trimming, according to the amount of cutting done. Speaking with a trade understanding, he regarded Exhibit 2, offered in evidence, as rough-trimmed mica, or mica partly trimmed with a knife, but an exhibit marked 1 as mica splittings. Witness stated that the object in roughly trimming the edges of mica is to split it easily; that an exhibit numbered 5 was rough-trimmed India mica which could not be used until it was cut into some shape or size, and that it was usually cut with a fixed bench shears, using a pattern.

Exhibit 1 appears to be an amber-colored mica, very thin sheets, with edges not regularly cut. Exhibit 2 was also amber colored, of thicker sheets than Exhibit 1, but with edges in part regular and as if roughly trimmed by some instrument. Witness called Exhibit 3 India mica splittings. They are exceedingly thin sheets with irregular edges. Exhibit 5 is mica, thicker than Exhibit 1, and evidently has been trimmed with a knife in a rough way.

Another experienced dealer in mica said that among dealers rough-trimmed mica and India or block mica are practically identical, and that the block mica included thumb-trimmed or knife-trimmed mica.

Still another witness of many years' experience in the mica business said that mica was imported into the United States as splittings, cut mica, uncut or block mica; that mica was called thumb trimmed, which may be knife-trimmed mica, mica that is not cut to a definite rectangular or other shape; that cut mica refers to mica cut to a definite size or design; and that knife trimming often means rough trimming of edges so that the mica can be split; and that in thumb trimming a knife was used, but not regularly, to cut to straight lines.

It is a fair deduction from this and other evidence in the record that dealers in mica recognize mica splittings, cut mica, and uncut mica. But we need not dwell at length upon various distinctions which may exist generally, for it has been agreed upon by counsel in the present case that the witness Westover's statement can be regarded as substantially correct. Mr. Westover is the secretary of the General

Electric Co., in charge of the mining of mica for the company, and undoubtedly his experience for 15 years in importing and looking after the manufacture of mica enables him to speak with accurate knowledge of the subject.   He describes mica in its different stages in this way:

(a) "Run-of-mine" mica, in its primary condition as taken from the mine.

(b) Mica that has been "rough cobbed," i. e., split into pieces a quarter of an inch or half an inch thick, with the rock and waste removed, with a loss of about 40 per cent in .weight.

(c) "Thumb-trimmed" mica which has been split to a thickness of one-eighth or one-sixteenth of an inch and cleaned, and whose rough edges have been taken off, chiefly by hand, but partly by the use of a hand knife.

(d) "Knife-trimmed" mica, made by trimming Class C with a machine knife, to remove all imperfections and give a smooth edge so that the mica may be cut to a design or may be split into very thin sheets.   The loss caused by this operation is from 10 to 13 per cent.

(e) "Splittings" from 1 mill to 1¼ mills in thickness.

We find that there is substantial evidence which was introduced by the importers to the effect that the mica involved herein was irregu- larly trimmed; that it could not be put to any immediate use in the form in which it was imported; that in changing the so-called thumb-trimmed mica to what is spoken of as rough knife-trimmed mica, the thumb-trimmed was advanced in value approximately 10 per cent, but that this advance was counterbalanced approximately by the loss sustained by the owner; and that in converting the so-called rough knife-trimmed or uncut mica into cut mica, the loss sustained was 50 per cent or more, and the advance in value 100 per cent or more.

It is admitted by counsel for the Government that the term "cut" mica has a definite commercial meaning, limited to mica that has been cut to some definite shape or size, and that none of the mica involved in this case has been so cut.   Nevertheless, it is argued by counsel that there is a character of trimming of mica that is covered by the statutory provision "mica, cut or trimmed," and that part of the mica under consideration has been trimmed in a way to require classification under the higher duty rate. · This contention is based upon the argument that, although the term "rough trimmed," as used in the tariff act of 1909, does not refer to mica that is not cut or trimmed to definite shapes or sizes, yet it applies to mica that has been spoken of by some witnesses as knife-trimmed or thumb-trimmed mica or that mica which would be included within the definition of knife-trimmed mica or paragraph D of the definitions given by the witness Westover and heretofore quoted.   Reduced to its simplest statement, the position of the Government involves the proposition that the words "cut" and "trimmed," as used in the statute, are not synonymous and are not used interchangeably.

To support this theory, the Government called witnesses who testified that there is a distinction between the terms "trimmed" and

"cut" mica. These witnesses qualified as persons familiar with commercial terms. A fair résumé of their testimony is that uncut mica includes various grades of trimmed mica, even though some such mica was trimmed beyond the stage of rough-trimmed mica. One of the witnesses said that there was a difference known in the trade between the words "cut" and "trimmed"; that cutting mica is "the cutting of it to a certain pattern that may require that mica can not be trimmed to a certain pattern but must be cut with a die or tool of some sort or other." Another witness said that "trimmed" and "cut" mica were not synonymous, in that trimmed mica is simply where the rough edges were taken off with a knife or sickle, while cut mica is that which is cut to forms or shapes with shears or dies and press; that rough-trimmed mica was synonymous with knife-trimmed; that Exhibit 5 (heretofore described) was knife-trimmed mica and not block mica. On cross-examination this witness said that knife trimming of mica did not change its shape substantially.

Another dealer in mica also said that the words "trimmed" and "uncut" were used in the sale of mica, but that cutting meant cutting with shears to exact sizes, while trimmed mica is where a knife or sickle goes around it or breaks off the edges by what is called thumb trimming; but that thumb trimming and rough trimming are practically the same.

Other dealers testified that "cut" and "trimmed" mica were not the same, "cut" mica being that which is cut to some definite shape or pattern, while "trimmed" mica is that which is trimmed, but not to any definite shape; that the India mica is closely trimmed; that Exhibit 5 is a knife-trimmed mica called closely trimmed.

One witness said that he regarded Exhibit 5 as "knife-trimmed" mica, and as being as closely trimmed as could be.

Another witness stated that in distinguishing between "trimmed" mica and what he called "rough-trimmed" mica the "knife trimmed" or "sickle trimmed" was better trimmed than "rough-trimmed" mica, in that one is done with a knife and the other with the hand.

As we read the evidence of the respective sides, bearing upon commercial meaning, we do not find it altogether satisfactory. The witnesses differed so materially and qualified their statements in such ways that it is difficult to take the record and to draw clear inferences.

But it was the opinion of the board, after seeing and hearing all the witnesses, that the evidence disclosed that none of the mica sheets covered by the protests of the importers were further advanced than "close trimmed" and "split." In their opinion, too, it was observed that none of the mica had been cut to any geometric shape or pattern, but that it was uneven in form and intended for purposes of manufacturing into mica plate or built-up mica. So, whether the evidence offered by the Government was sufficient to establish well-known

significations in regard to the trade meaning of the terms "cut" and "trimmed" and "rough trimmed," used in the tariff acts respecting mica, and which applied to the importations in the present case, or whether the evidence of the importers to the effect that "rough trimmed" mica refers to all mica, handled commercially, but which is not cut or trimmed to definite shapes or sizes, was convincing, presented questions upon which there was a serious conflict of view on the part of those who had dealt in mica for years, and who had had long experience in the commerce of the article. The board concluded that the evidence of the importers was of greater weight and we find no sufficient reason to hold to the contrary. Their conclusion finds support, too, in the practice which has existed in the customhouses of the country for many years, it having been decided more than once, under tariff sections like 91, that mica cut or trimmed meant that which is cut into sizes and shapes ready for use. This general view was followed in Abstract 377 (T. D. 25023). Again, as persuasive, it appears that at the tariff hearings had before the Committee on Ways and Means of Congress, in 1908 and 1909, attention was invited to the distinction recognized by the trade between "thumb-trimmed" and "knife-trimmed" mica, and although it was requested that more definite provisions be made for "cut" and "uncut" mica, and for a "closely trimmed" mica, as distinguished from "rough trimmed," no action was taken or change in that particular made. This is important, because, as indicated, section 184 of the tariff act of 1897 and paragraph 91 of the tariff act of 1909 are precisely the same in phraseology, except for the rate of duty upon "rough-trimmed" mica and "cut" mica, and words imposing an additional duty upon mica plates or built-up mica and manufactures of mica, or of which mica is the component material of chief value. It would seem to follow, therefore, that cut or trimmed mica means mica cut or trimmed to geometric shapes or so cut or trimmed to definite shapes or sizes, that the mica is a finished product, as contradistinguished from a rough trim or rough knife trim, not finishing the product.

Nor can we sustain the counsel for the Government in their contention that the mica splittings are dutiable as mica cut or trimmed or as manufactures of mica. The splittings are proved to be from rough knife-trimmed or sickle-trimmed mica and appear to be no further advanced in trimming than rough-trimmed mica. They are irregular in shape, and as imported are not ready for use. It is also quite clear to us that the splittings are not manufactures of mica. There has not been such an application of labor as to transform the mica into a new and different article "having a distinct name, character, or use." Baumgarten v. Magone (50 Fed. Rep., 71).

To produce splitting, application of some labor has been had, but it does not follow, of course, that they are manufactured articles within

the meaning of the tariff laws. Bamboo, split and cut into foot lengths and bound for shipment, has been held not to be a manufactured article. Brauss & Co. *v.* United States (120 Fed. Rep., 1017). And it has been held by the Board of General Appraisers that mica plate made of splittings by pasting the splittings together with shellac and alcohol is not a manufacture of mica. G. A. 6470 (T. D. 27682).

Myers et al. *v.* United States (110 Fed. Rep., 940) is in point, in that it was held by Judge Cox that small sheets or pieces of mica which had fallen off in the process of thumb trimming, varying in width from 1 to 2 inches and in length from 2 to 3½ inches, were unmanufactured mica and dutiable under paragraph 184 of the tariff act of 1897, the court declining to hold that the merchandise was waste not specially provided for.

As these views dispose of the more important features of the case, it follows that the decision of the board must be *affirmed.*

MONTGOMERY, Presiding Judge, and DE VRIES, Associate Judge, took no part in the hearing or decision of this case.